**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Tel: (914) 874-0710
Fax: (914) 206-3656
E-Mail: pfraietta@bursor.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

PERCY RAMOS, individually and on behalf of all others similarly situated,

Plaintiff,

v.

KICKS CREW LLC,

Defendant.

Case No. 4:26-cv-2272

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff Percy Ramos brings this action on behalf of himself, and all others similarly situated (the "Class Members"), against Defendant Kicks Crew LLC. ("Defendant" or "Kicks Crew"). Plaintiff makes the following allegations pursuant to the investigation of his counsel based upon information and belief, except as to allegations specifically pertaining to himself, which are based on personal knowledge.

## NATURE OF THE ACTION

1. This is a class action lawsuit brought on behalf of all U.S. residents who accessed and navigated www.kickscrew.com (the "Website") and whose electronic communications were intercepted or recorded by advertising technology provided by Meta Platforms, Inc. ("Facebook" or "Meta"), Google, LLC ("Google"), and Snap, Inc. ("Snap" or "Snapchat") (collectively the "Third Parties").

2. Kicks Crew is a "trusted and seamless digital marketplaces for sneakers and expanding into apparel and accessories . . . offer[ing] over 400,000 unique styles online and ship[ing] worldwide."[1] Kicks Crew uses its Website as an online marketplace, where consumers can browse, and purchase various products.

3. Defendant expressly warrants to its customers that although its "website utilises standard technology called 'cookies' and web server logs to collect information about how [Defendant's] site is used . . . . None of this information is associated with [website users] as an individual."

4. Despite its express promises and representations of privacy, Defendant aids, agrees with, employs, or otherwise enables the Third Parties to eavesdrop on communications sent and received by Plaintiff and Class Members on the Website that Defendant owns and operates, including communications that contain personally identifiable information ("PII") and purchase information. By failing to procure consent before disclosing these communications to the Third Parties, Defendant violated the Electronic Communications Privacy Act ("ECPA") (18 U.S.C.

[1] LINKEDIN, *About Us*, https://www.linkedin.com/company/kickscrew.

§2510, *et seq.*); the California Invasion of Privacy Act ("CIPA") § 631–32, 638.51; and the California Constitution.

5. Plaintiff brings this action for legal and equitable remedies resulting from these illegal actions.

**PARTIES**

***Plaintiff***

6. Plaintiff Percy Ramos is a resident and citizen of San Pablo, California. At all relevant times, Plaintiff maintained active accounts with Facebook, Google, and Snapchat. When creating his Facebook, Google, and Snapchat accounts, Plaintiff provided them with his PII, including his full name, date of birth, phone number, and email address. Plaintiff used the same device to access the Website that he did to access his Facebook, Google, and Snapchat accounts. Plaintiff was in California when he visited the Website.

7. On or around December 2025, Plaintiff accessed Defendant's Website—while in California—and purchased a Men's Nike Sportswear Athleisure Casual Sports Woven Jacket on Defendant's Website. Despite Defendant's representations of confidentiality, Plaintiff's communications during this visit were intercepted and disclosed to Third Parties through the tracking technologies, including communications that contained Plaintiff's identity and information about his purchase. Neither Defendant nor the Third Parties procured Plaintiff's consent prior to these interceptions, nor was Plaintiff on notice of the fact that such interceptions were occurring. Such disclosures are a violation of Plaintiff's privacy and were done intentionally for targeted advertising purposes.

8. Given Defendant's promises to keep his personal information from disclosure, Plaintiff possessed an expectation of privacy in communications that contained such information, and he never consented to Defendant intercepting and disclosing those confidential communications.

***Defendant***

9. Defendant Kicks Crew LLC is a Delaware limited liability company, headquartered in New York, New York. Defendant owns and operates the Website.

10. Defendant knowingly and intentionally incorporated a host of tracking technologies for marketing, advertising, and analytics purposes on the Website without disclosure to its users, including the tracking technologies provided by Third Parties. Defendant configured this technology to disclose its customers' personally identifiable information despite express promises to the contrary.

**JURISDICTION AND VENUE**

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the Electronic Communications Privacy Act, 18 U.S.C. § 2511). This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367. Further, this action is a putative class action, and Plaintiff alleges that at least 100 people comprise the proposed class, that the combined claims of the proposed class members exceed $5,000,000 exclusive of interest and costs, and that at least one member of the proposed class is a citizen of a state different from Defendant.

12. This Court has personal jurisdiction over Defendant because Defendant purposefully directs its business activities in this District by offering its products to residents of this District and performing services in this District. Further, Plaintiff was residing in this District when he accessed the Website and had the Tracking Technologies installed on his device, which Defendant knew would cause harm throughout California, including within this District.

13. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Plaintiff resides in this District, Defendant does substantial business in this District, and a substantial part of the events giving rise to the claim occurred in this District.

**FACTUAL ALLEGATIONS**

**A. Defendant's Website and Privacy Representations**

14. Defendant owns and operates the Website. Unbeknownst to customers, Defendant integrates tracking codes from third parties, including Meta, Google, and Snapchat, into the Website (the "Tracking Technologies").

15. Throughout the Website, Defendant promises customers that it will keep their personally identifiable electronic communications confidential.

16. For example, Defendant's cookie policy explicitly states information collected from cookies and web server logs is collected on an aggregate basis and is not associated with individuals' identities.[2] *See* Figure 1.




**Figure 1**

17. Despite clear promises to the contrary, Defendant intentionally intercepts and discloses customers' identifiable information and purchase information with third parties.

18. Unbeknownst to consumers, including Plaintiff, Defendant shares sensitive details about its customers' identities and purchases with Third Parties. Defendant intercepts and discloses consumers'—including Plaintiff's—Website browsing activities and eavesdrop on users' private communications on the Website.

19. As courts across the country have recognized, the identifiers that the Tracking Technologies capture—names, email address, phone number, and social media IDs—constitute "directly personal information." By capturing this information, contrary to its explicit

[2] KICKS CREW LLC, *Cookies*, https://www.kickscrew.com/cookies.

representation not to, Defendant fails to receive consent from customers to intercept their communications.

**B. Consumers Have A Financial Stake In Companies' Promises Relating To Their Data Privacy**

20. "In an era where every click, tap or keystroke leaves a digital trail, Americans remain uneasy and uncertain about their personal data and feel they have little control over how it's used."[3]

21. "The value of consumer data often comes from identifying users and combining their data from various sources. This is possible, in part, through the ubiquity of personally identifiable information (PII) and unique identifiers, as well as identifying individuals from non-PII, such as aggregated or anonymized data. The ability to identify users enables website and app operators to combine data and track user activity across devices."[4]

22. "Advertisers, as well as website and app operators, have incentives to improve their ad targeting by collecting detailed information about each user. Advertisers might expect more precise targeting to increase sales. Websites' revenue may depend on how frequently users click on the ad or how much time users spend viewing the ad."[5]

23. For retailers—like Defendant—the ability to compile consumer patterns into algorithms improves how precisely they can sell to those same consumers.[6]

24. With increased surveillance of consumers' purchase patterns, consumer concern over the control of their data privacy has continued to grow:

- "86% of Americans are more concerned about their privacy and data security than the state of the U.S. economy – but two-thirds either don't know or are misinformed about how their data is being used and who has access to their

---

[3] Colleen McClain, Michelle Faverio, Monica Anderson, & Eugenie Park, *How Americans View Data Privacy*, PEW RESEARCH CENTER (October 18, 2023), https://www.pewresearch.org/internet/2023/10/18/how-americans-view-data-privacy/

[4] CLARE Y. CHO & LING ZHU, CONG. RSCH. SERV., R47298, *Online Consumer Data Collection and Data Privacy*, (October 31, 2022), https://www.congress.gov/crs-product/R47298.

[5] Clare Y. Cho, CONG. RSCH. SERV., IF11448, *How Consumer Data Affects Competition Through Digital Advertising*, (January 26, 2023), https://www.congress.gov/crs-product/IF11448.

[6] Charles Duhigg, *How Companies Learn Your Secrets*, N.Y. TIMES, Feb. 16, 2012, https://www.nytimes.com/2012/02/19/magazine/shopping-habits.html (example of how Target used consumer characteristics to identify and market to pregnant women).

privacy"[7]

- "67% of respondents don't understand what data privacy means or how their data is being used"[8]
- The public increasingly says they don't understand what companies are doing with their data. Some 67% say they understand little to nothing about what companies are doing with their personal data, up from 59%[9]
- 72% of Americans say there should be more [government] regulation than there is now; just 7% say there should be less. [10]
- Roughly four-in-ten Americans say they are *very* worried about companies selling their information to others without them knowing (42%) or people stealing their identity or personal information (38%).[11]
- 81% say they feel very or somewhat concerned with how companies use the data they collect about them. [12]
- People don't feel in control: Roughly three-quarters or more feel they have very little or no control over the data collected about them by companies (73%)[13]
- 36% strongly agree or somewhat agree they're in control of personal data. A third (29%) were concerned about how retailers and e-commerce companies use consumer data.[14]
- An overwhelming majority (85%) of consumers are taking at least one step to address their privacy and security concerns. However, 75% feel they should be doing more, and many indicate they feel a sense of powerlessness: They believe that companies can track them no matter what they do (26%), don't know what actions they can take (25%), and think hackers can access their data no matter what they do (21%).[15]

25. This concern over data privacy also impacts consumer purchase behavior:

---

[7] Gary Drenik, *Data Privacy Tops Concerns For Americans – Who Is Responsible For Better Data Protections?*, FORBES, (Dec. 8, 2023) https://www.forbes.com/sites/garydrenik/2023/12/08/data-privacy-tops-concerns-for-americans--who-is-responsible-for-better-data-protections/.

[8] *Id.*

[9] Colleen McClain, Michelle Faverio, Monica Anderson, & Eugenie Park, *How Americans View Data Privacy*, PEW RESEARCH CENTER, (Oct. 18, 2023) https://www.pewresearch.org/internet/2023/10/18/how-americans-view-data-privacy/.

[10] *Id.*

[11] Colleen McClain, Michelle Faverio, Monica Anderson, & Eugenie Park, *Views of data privacy risks, personal data and digital privacy laws*, PEW RESEARCH CENTER, (Oct. 18, 2023) https://www.pewresearch.org/internet/2023/10/18/how-americans-view-data-privacy/

[12] *Id.*

[13] *Id.*

[14] *Survey Shows Consumers Concerned About Personal Data, Privacy and Internet Safety for Children,* KINETIC, (Jan. 24, 2025) https://www.windstream.com/blog/consumer-data-privacy-survey-2025.

[15] *New Deloitte Survey: Increasing Consumer Privacy and Security Concerns in the Generative AI Era*, DELOITTE, (Dec. 2, 2024) https://www.deloitte.com/us/en/about/press-room/increasing-consumer-privacy-and-security-concerns-in-the-generative-ai-era.html.

- 79% of Americans are concerned about how companies use their data.[16]
- 75% of Americans believe there should be more regulations to protect their privacy from companies collecting consumer data without their consent or knowledge. [17]
- 60% of users say they would spend more money with a brand they trust to handle their personal data responsibly.[18]
- 52% of American users chose not to use a product or service due to worries about how much personal data would be collected about them.[19]
- 48% of users have stopped buying from a company over privacy concerns.[20]
- 33% of users have terminated relationships with companies over data. They left social media companies, ISPs, retailers, credit card providers, and banks or financial institutions.[21]
- 81% of users say the potential risks they face from companies collecting data outweigh the benefits[22]

26. Consumer concerns over their privacy have been addressed at both the state and federal levels by the California Legislature and the Federal Trade Commission.

---

[16] Brooke Auxier, Lee Rainie, Monica Anderson, Andrew Perrin, Madhu Kumar, & Erica Turner, *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, PEW RESEARCH CENTER, (Nov. 15, 2019) https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.

[17] Branka Vuleta, *18 Chilling Privacy Statistics in 2023*, LEGALJOBS (Jul. 22, 2025) https://legaljobs.io/blog/privacy-statistics.

[18] *Global Consumer State of Mind Report 2021,* TRUATA, https://www.truata.com/resources/report/global-consumer-state-of-mind-report-2021/.

[19] Andrew Perrin, *Half of Americans have decided not to use a product or service because of privacy concerns*, PEW RESEARCH CENTER, (Apr. 14, 2020) https://www.pewresearch.org/short-reads/2020/04/14/half-of-americans-have-decided-not-to-use-a-product-or-service-because-of-privacy-concerns/.

[20] Ratnesh Pandey, *Staying Cyber-Secure While Working From Home*, TABLEAU, (updated Jul. 18, 2024) https://public.tableau.com/app/profile/ratnesh2928/viz/Stayingcyber-securewhileworkingfromhome/Stayingcyber-securewhileworkingfromhome/.

[21] *Consumer Privacy Survey*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-cybersecurity-series-2021-cps.pdf.

[22] Brooke Auxier, Lee Rainie, Monica Anderson, Andrew Perrin, Madhu Kumar, & Erica Turner, *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, PEW RESEARCH CENTER, (Nov. 15, 2019) https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.

**C. The Federal Trade Commission and California Legislature's Protection of Consumer Data**

27. The Federal Trade Commission has taken action "against dozens of companies that claimed to safeguard the privacy or security of users' information but didn't live up to their promises in the day-to-day operation of their business."[23]

28. Notably, the Federal Trade Commission seeks enforcement against companies who violate their representations about safeguarding consumer information:

> When companies tell consumers they will safeguard their personal information, the FTC can and does take law enforcement action to make sure that companies live up these promises. The FTC has brought legal actions against organizations that have violated consumers' privacy rights, or misled them by failing to maintain security for sensitive consumer information, or caused substantial consumer injury. In many of these cases, the FTC has charged the defendants with violating Section 5 of the FTC Act, which bars unfair and deceptive acts and practices in or affecting commerce. In addition to the FTC Act, the agency also enforces other federal laws relating to consumers' privacy and security.[24]

29. At the state level, the California Legislature is at the forefront of protecting citizens' privacy. Take, for example, the California Online Privacy Protection Act, requiring companies to "conspicuously post [their] privacy policy" and "[d]isclose whether other parties may collect personally identifiable about an individual consumer's online activities over time and across different Web sites when a consumer uses the operator's Web site or service."[25] This statute also defines "personally identifiable information ("PII")" as "[a] first and last name," "[a] home or other physical address," "[a]n e-mail address," "[a] telephone number," and "[a]ny other identifier that permits the physical or online contacting of a specific individual."[26]

---

[23] *Marketing Your Mobile App: Get It Right from the Start,* FEDERAL TRADE COMMISSION, https://www.ftc.gov/business-guidance/resources/marketing-your-mobile-app-get-it-right-start.

[24] *Privacy and Security Enforcement*, FEDERAL TRADE COMMISSION, www.ftc.gov/news-events/topics/protecting-consumer-privacy-security/privacy-security-enforcement.

[25] Cal. Bus. & Prof. Code § 22575(a).

[26] Cal. Bus. & Prof. Code § 22575(a).

**D. Overview of the California Invasion of Privacy Act and the Federal Wiretap Act**

30. The California Legislature enacted CIPA to protect certain privacy rights of California citizens. The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

31. The California Supreme Court has repeatedly stated the "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call*." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

32. Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360-61 (emphasis added; internal citations omitted); *see also Smith v. LoanMe, Inc.*, 11 Cal. 5th 183, 200 (2021) (reaffirming *Ribas*).

33. As part of CIPA, the California Legislature introduced § 631(a), which imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192 (1978). Specifically, CIPA § 631(a) prohibits any person or entity from:

> (i) "intentionally tap[ping], or mak[ing] any unauthorized connection . . . with any telegraph or telephone wire";
>
> (ii) "willfully and without the consent of all parties to the communication . . . read[ing], or attempt[ing] to read, or to learn the contents or meaning of any . . . communication while the same is in transit or passing

over any wire, line, or cable, or is being sent from, or received at any place within [California]"; or

(iii) "us[ing], or attempt[ing] to use . . . any information so obtained."

34. CIPA § 631(a) also penalizes those who "aid[], agree[] with, employ[], or conspire[] with" or "permit[]" "any person" to conduct the aforementioned wiretapping.

35. CIPA further outlaws "us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication." Cal. Penal Code § 632. The term "confidential communications" means "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes . . . circumstances in which the parties to the communication may reasonably expect that the communication may be overheard or recorded." Cal. Penal Code § 632(c).

36. Also relevant here, CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

37. A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

38. A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(b).

39. In plain English, a "pen register" is a "device or process" that records *outgoing* information, while a "trap and trace device" is a "device or process" that records *incoming* information.

40. Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that telephone line. As technology advanced,

however, courts have expanded the application of these surveillance devices to Internet tracking technology.

41. For example, if a user sends an email, a "pen register" might record the email address it was sent from because this is the user's *outgoing* information. On the other hand, if that same user receives an email, a "trap and trace device" might record the email address it was sent from because this is *incoming* information that is being sent to that same user.

42. Although CIPA was enacted before the dawn of the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc.* 2013 WL 5423918, at *21 (N.D. Cal. Sep. 26, 2013). Thus, courts have found that internet tracking technology like those here fall under the purview of CIPA § 638.51. *See, e.g.*, *Shah v. Fandom, Inc*, 754 F. Supp. 3d 924, 930 (N.D. Cal. 2024) (finding trackers similar to those at issue here were "pen registers" and noting "California courts do not read California statutes as limiting themselves to the traditional technologies or models in place at the time the statutes were enacted"); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709, at *3–4 (N.D. Cal. Dec. 12, 2024) (same); *Lesh v. Cable News Network, Inc.,* 767 F. Supp. 3d 33, 40–42 (S.D.N.Y. 2025) (same); *Moody v. C2 Educ. Sys. Inc.,* 742 F. Supp. 3d 1072, 1077 (C.D. Cal. 2024) ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51"); *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023) (referencing CIPA's "expansive language" when finding software was a "pen register"); *Javier v. Assurance IQ, LLC,* 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications").

43. This accords with the fact that, "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.* 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

44. Individuals may bring an action against a violator of CIPA § 631, 632, and 638.51 for $5,000 per violation. Cal. Penal Code § 637.2.

45. In a manner similar to CIPA, the Federal Wiretap Act (i.e., the ECPA) creates "a comprehensive scheme for the regulation of wiretapping and electronic surveillance."[27]

46. Although the ECPA does not apply "where one parties to the communication has given consent[,]" the ECPA eliminates the one-party consent exception when the conduct was for the "the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."[28]

**E. Function of the Tracking Technologies**

47. Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications. Each device (such as a computer, tablet, laptop, or smartphone) accesses web content through a web browser (*e.g.*, Chrome, Safari, Edge, etc.).

48. Every website is hosted by a computer server that holds the website's contents and through which the entity in charge of the website exchanges communications with the consumer's device via web browsers.

49. Web communications consist of HTTP Requests and HTTP Responses and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- <u>HTTP Request</u>: an electronic communication sent from a device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

- <u>Cookies</u>: a small text file that can be used to store information on the device which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

---

[27] *People v. Roberts*, 184 Cal. App. 4th 1149, 1167 (2010).

[28] 18 U.S.C. § 2511(d)

- HTTP Response: an electronic communication that is sent as a reply to the device's web browser from the host server in response to a HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.

50. A consumers' HTTP Request essentially asks the website to retrieve certain information (such as payment submissions and user selections), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons, and other features that appear on the consumer's screen as they navigate the Website).

51. Every website is comprised of Markup and "Source Code." Source Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

52. Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user. The Meta, Google, and Snapchat tracking codes embedded on the Website by Defendant constitute Source Code.

53. For example, to make Defendant's Websites load on a user's internet browser, the browser sends an "HTTP request" or "GET" request to Defendant's server where the relevant Websites' data is stored. In response to the request, Defendant's server sends an "HTTP response" back to the browser with a set of instructions. A general diagram of this process is pictured at Figure 2, which explains how Defendant's Websites transmit instructions back to users' browsers in response to HTTP requests.




**Figure 2**

**F. Meta's Tracking Technology**

54. Meta is one of the largest advertising companies in the country. To date, Meta generates nearly 98% of its revenue through advertising, [29] bringing in an excess of $160 billion in 2024.[30]

55. Meta's advertising business began back in 2007 with the creation of "Facebook Ads," which was marketed as a "completely new way of advertising online" that would allow "advertisers to deliver more tailored and relevant ads." [31]

56. Today, Meta provides advertising on its own platforms, such as Facebook and Instagram, as well as websites outside these apps through the Facebook Audience Network. Facebook alone has more than 3 billion active users. [32]

57. Meta's advertising business has been extremely successful due, in large part, to Meta's ability to target people at a granular level. "Among many possible target audiences, [Meta] offers advertisers," for example, "1.5 million people 'whose activity on Facebook suggests that they're more likely to engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'" [33]

---

[29] Emmanuel Oyedegi, *Meta's ad business generated 98% of its total revenue in Q2 2025*, TECHLOY (Jul. 31, 2025) https://www.techloy.com/metas-ad-business-generated-98-percent-of-its-total-revenue-in-q2-2025/.

[30] Stacy Jo Dixon, *Meta's ad business generated 98% of its total revenue in Q2 2025*, STATISTA (Jan. 30, 2025) https://www.statista.com/statistics/271258/facebooks-advertising-revenue-worldwide/?srsltid=AfmBOopC65RAw3WSm3y4ZtdYBpTiXhsmiFK7kSnFcm14WOV7esTu_uQ_https://www.statista.com/statistics/271258/facebooks-advertising-revenue-worldwide/?srsltid=AfmBOopC65RAw3WSm3y4ZtdYBpTiXhsmiFK7kSnFcm14WOV7esTu_uQ_

[31] Cecile Ho, *Announcing Facebook Pixel*, META (Oct. 14, 2015) https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/.

[32] Naveen Kumar, *Facebook Users Statistics (2025) – Latest Worldwide Data*, DEMANDSAGE (Aug. 19, 2015) https://www.demandsage.com/facebook-statistics/.

[33] Natasha Singer, *What You Don't Know About How Facebook Uses Your Data*, NEW YORK TIMES (Apr. 11, 2018) https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html.

58. Given the highly specific data used to target specific users, it is no surprise that millions of companies and individuals utilize Meta's advertising services. Meta generates substantially all of its revenue from selling advertisement placements:[34]

**Table 1:**

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|---|---|---|---|
| 2021 | $117.93 billion | $114.93 billion | 97.46% |
| 2020 | $85.97 billion | $84.17 billion | 97.90% |
| 2019 | $70.70 billion | $69.66 billion | 98.52% |
| 2018 | $55.84 billion | $55.01 billion | 98.51% |

59. One of Meta's most powerful advertising tools is the Meta Pixel, formerly known as the Facebook Pixel, which launched in 2015 and its SDK.

60. Meta touted the Meta Pixel as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website." According to Meta, to use Meta Pixel an advertiser need only "place a single pixel across [its] entire website to report and optimize for conversions" so that the advertiser could "measure the effectiveness of [its] advertising by understanding the action people take on [its] website."[35]

61. The Meta Pixel is a snippet of code embedded on a third-party website that tracks users' activity as the users navigate through a website. As soon as a user takes any action on a webpage that includes the Meta Pixel, the code embedded in the page re-directs the content of the user's communication to Meta while the exchange of the communication between the user and website provider is still occurring.

62. Through this technology, Meta intercepts each page a user visits, what buttons they click, as well as specific information they input into the website and what they searched. The Meta Pixel sends each of these pieces of information to Meta with other identifiable information, such as the user's IP address. Meta stores this data on its own server, in some instances, for years on end.

---

[34] *Facebook Ad Revenue (2017–2027),* OBERLO, https://www.oberlo.com/statistics/facebook-ad-revenue.

[35] Cecile Ho, *Announcing Facebook Pixel*, META (Oct. 14, 2015) https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/.

63. This data is often associated with the individual user's Facebook account. For example, if the user is logged into their Facebook account when the user visits Defendant's Website, Meta receives third-party cookies allowing Meta to link the data collected by Meta Pixel to the specific Facebook user.

64. For example, Meta uses cookies named c_user, datr, fr and fbp to identify its account holders. Meta stores or updates Meta-specific cookies every time a person accesses their Facebook account from the same web browser.

65. The Meta Pixel can access these cookies and send certain identifying information like the user's Facebook ID to Facebook along with the other data relating to the user's website inputs.

66. The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user account has one—and only one—unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

67. A User's Facebook ID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the User, including pictures, personal interests, work history, relationship status, and other details. Because the User's Facebook Profile ID uniquely identifies an individual's Facebook account, Facebook—or any ordinary person—can easily use the Facebook Profile ID to quickly and easily locate, access, and view the User's corresponding Facebook profile. To find the Facebook account associated with a c_user cookie, one simply needs to type www.facebook.com/ followed by the c_user ID.

68. The Facebook datr cookie identifies the User's web browser. It is an identifier unique to each person's specific web browser and is another way Facebook can identify Facebook users.

69. The Facebook fr cookie is a combination of the Facebook ID (c_user) and the browser ID (datr) cookie values.

70. A User who accessed Defendant's Website while logged into (or recently having logged into) Facebook would have their browser transmit the c_user, datr and fr cookies to Facebook.

71. At each stage, Defendant also utilized the _fbp cookie, which attaches to a browser as a first-party cookie, and which Facebook uses to identify a browser and a user.

72. Defendant intentionally configured the Tracking Technologies installed on its Website to capture both the "characteristics" of individual's communications with its Website (their IP addresses, Facebook ID, User-IDs, cookie identifiers, device identifiers, emails, and phone numbers) and the "content" of these communications (the buttons, links, pages, and tabs they click and view related to the shopping and products sought from Defendant).

73. Meta can also link the data to a specific user through the "Facebook Cookie." The Facebook Cookie is a workaround to recent cookie-blocking techniques, including one developed by Apple, Inc., to track users, including Facebook users.

74. Lastly, Meta can link user data to individual users through identifying information collected through Meta Pixel using what Meta calls "Advanced Matching." There are two forms of Advanced Matching: manual matching and automatic matching. Using Manual Advanced Matching the website developer manually sends data to Meta to link users. Using Automatic Advanced Matching, the Meta Pixel scours the data it receives to search for recognizable fields, including name and email address to match users to their Facebook accounts.[36]

75. Importantly, even if Meta Pixel collects data about a non-Facebook user, Meta still retains and uses the data collected through Meta Pixel in its analytics and advertising services. These non-users are referred to as having "shadow profiles" with Meta.[37]

76. At the time Plaintiff used Defendant's Website, he maintained active social media account on Facebook. Plaintiff accessed the Defendant's Website from the same device he used to visit Facebook, and Meta associated the data it collected about him from Defendant's Website with his Facebook account and other PII. Meta was also able to associate this information with his identity by matching hashed identifiers (name, phone, email, and address) to its own records.

---

[36] While Meta purports to "hash" the PII provided by users, Meta actually uses the hashed format *specifically to link the Meta Pixel data to Facebook profiles*.

[37] Jürgen Graf, *Investigating shadow profiles: The data of others*, TECHXPLORE (Sept. 22, 2023) https://techxplore.com/news/2023-09-shadow-profiles.html.

77. Meta offers an analogous mobile version of the Meta Pixel known as an SDK to app developers. Meta's SDK allows app developers "to track events, such as a person installing your app or completing a purchase." By tracking these events developers can measure ad performance and build audiences for ad targeting.[38]

78. Meta's SDK collects three types of App Events. Automatically Logged Events are "log[] app installs, app sessions, and in-app purchases." Standard Events are "popular events that Facebook has created for the app." Custom Events are "events [the app developers] create that are specific to [the] app."[39]

79. Once the data intercepted through the Meta Pixel or SDK is processed, Meta makes this data available through its Events Manager and Ads Manager pages, along with tools and analytics to reach these individuals through future Facebook ads. For instance, this data can be used to create "custom audiences" to target the user, as well as other Facebook users who match members of the audiences' criteria.[40]

80. In addition to using the data intercepted through Meta Pixel and SDK to provide analytics services, Meta uses this data to improve its personalized content delivery, advertising network, and machine-learning algorithms, including by improving its ability to identify and target users.

81. Meta has no way to limit or prohibit the use of data collected through Meta Pixel and its SDK given Meta's open systems and advanced algorithms.

82. According to leaked internal Meta documents, one employee explained "You pour that ink [i.e., data] into a lake of water . . . at it flows . . . everywhere . . . How do you put that ink back in the bottle? How do you organize it again, such that it only flows to the allowed places in the lake?"[41]

---

[38] *Meta App Event Tracking*, META, https://developers.facebook.com/docs/app-events/.

[39] *Meta App Event Tracking: Overview*, META, https://developers.facebook.com/docs/app-events/.https://developers.facebook.com/docs/app-events/overview.

[40] *Audience Network*, META, https://developers.facebook.com/docs/app-events/overview.https://developers.facebook.com/docs/audience-network/.

[41] Lorenzo Franceschi-Bicchierai, *Facebook Doesn't Know What It Does With Your Data, Or Where It Goes: Leaked Document*, VICE, (Apr. 26, 2022)

83. In these same leaked documents, another employee explained Meta does "not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.' And yet, that is exactly what regulators expect us to do, increasing our risk of mistakes and misrepresentation."[42] Thus, once the data enters the Meta system, either through its SDK or Pixel, the data can be used for any and all purposes.

84. Meta's own employees confirmed no one at Meta can state confidently where all the data about a user is stored and used. In a recent court hearing as part of the Cambridge Analytica scandal of 2018, Meta's own engineers testified there was not a "single person" at Meta who could answer that question.[43]

85. Defendant uses at least the Meta Pixel on its Website. As a result, Defendant disclosed and Meta intercepted users'—including Plaintiff's—interactions on the Website. Meta received at least the customer's name, email, location, and purchase information which it could associate with embedded cookies to further associate the information with the customer's profile. Meta and Defendant used this data, as well as other data uploaded directly to Meta by Defendant, so that Defendant could run advertisements using its services.

**G. Google's Tracking Technologies**

86. Google is one of the most valuable publicly traded companies in the world with a market capitalization of over $1 trillion dollars. Google fancies itself a "tech" company, but Google, at its core, is an advertising company.

87. Google "make[s] money" from "advertising products [that] deliver relevant ads at just the right time," generating "revenues primarily by delivering both performance advertising and

---

https://www.vice.com/en/article/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes/.

[42] *Id.*

[43] Isober Asher Hamilton, *Senior Facebook engineers say no one at the company knows where your data is kept*, BUSINESS INSIDER, (Sept. 8. 2022) https://www.businessinsider.com/meta-doesnt-know-where-all-your-data-is-engineers-say-2022-9#:~:text=Two%20Meta%20engineers%20were%20grilled,there%20for%20almost%20nine%20years.

brand advertising." In 2020, Google generated $146.9 billion in advertising revenue, which amounted to more than 80 percent of Google's total revenues for the year. Google generated an even higher percentage of its total revenues from advertising in prior years:

**Table 2:**

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|---|---|---|---|
| 2021 | $257.6 billion | $209.5 billion | 81.33% |
| 2020 | $182.5 billion | $146.9 billion | 80.49% |
| 2019 | $161.9 billion | $134.8 billion | 83.29% |
| 2018 | $136.8 billion | $116.5 billion | 85.12% |

88. Google offers several analytics products, including SDKs and a tracking pixel, which exist solely to help drive ad revenue. For instance, Google's SDK and pixel integrate with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google Ad Manager, to direct more individuals to use Google's ad network and products increasing Google's overall ad revenue. Products like Google's SDK and its tracking pixel also improve the company's advertising network and capabilities by providing more wholesome profiles and data points on individuals.

89. One of these SDKs and tracking pixels is Google Analytics. Google first launched a version of Google Analytics in 2005 as a tool for website traffic analysis. In 2007, Google launched Google Analytics Synchronous code with new tracking functionality, such as the ability to track commerce transactions. Two years later, Google launched the Google Analytics Asynchronous code, which allowed webpages to load faster and improved data collection and accuracy.

90. Google continued updating its analytics platform, launching Universal Analytics in 2012. Universal Analytics offered new tracking codes and tools that provided more in-depth information about user behavior. Also, Universal Analytics enabled tracking the same user across multiple devices through its addition of the User-ID feature, which "associate[s] a persistent ID for a single user with that user's engagement data from one or more sessions initiated from one or more devices."

91. In 2020, Google launched Google Analytics 4, a platform combining Google Analytics with Firebase to analyze both app and web activity.

92. Since launching Google Analytics, Google has become one of the most popular web analytics platforms on the internet. Indeed, Google had a $62.6 billion increase in advertising revenues in 2021, compared to 2020, after launching its most recent version of Google Analytics.

93. Google touts Google Analytics as a marketing platform that offers "a complete understanding of your customers across devices and platforms." It allows companies and advertisers that utilize it to "understand how your customers interact across your sites and apps, throughout their entire lifestyle," "uncover new insights and anticipate future customer actions with Google's machine learning to get more value out of your data," "take action to optimize marketing performance with integrations across Google's advertising and publisher tools," and "quickly analyze your data and collaborate with an easy-to-use interface and shareable reports."

94. Google Analytics is incorporated into third-party websites and apps, including the Website, by adding a small piece of JavaScript measurement code to each page on the site—even when users are logged into their account portals. This code immediately intercepts a user's interaction with the webpage every time the user visits it, including what pages they visit and what they click on. The code also collects PII, such as IP addresses and device information related to the specific computing device a consumer (or users) is using to access a website. The device information intercepted by Google includes the user's operating system, operating system version, browser, language, and screen resolution.

95. In other words, when interacting with the Website, an HTTP Request is sent to Defendant's server, and that server sends an HTTP Response including the Markup that displays the website visible to the user and Source Code, including Google's tracking technologies.

96. Thus, Defendant is essentially handing its users a tapped device, and once the Webpage is loaded onto the users' browser, the software-based wiretap is quietly waiting for private communications on the Website to trigger the tap, which intercepts those communications intended only for the Defendant and transmits those communications to Google.

97. Once Google's software code collects the data intercepted from the Website, it packages the information and sends it to Google for processing. Google Analytics enables the company or advertiser to customize the processing of the data, such as applying filters. Once the data is processed, it is stored on a Google database and cannot be changed.

98. After the data has been processed and stored in the database, Google uses this data to generate reports to help analyze the data from the webpages. These include reports on acquisition (*e.g.*, information about where your traffic originates, the methods by which users arrive at your site or app, and the marketing efforts you use to drive traffic), engagement (*e.g.*, measure user engagement by the events and conversion events that users trigger and the web pages and app screens that user visits, and demographics (*e.g.*, classify your users by age, location, language, and gender, along with interests they express through their online browsing and purchase activities).

99. In addition to using the data collected through Google Analytics to provide marketing and analytics services, Google also uses the data collected through Google Analytics to improve its ad targeting capabilities and data points on users.

100. The Website utilizes Google's pixel and SDK. As a result, Google intercepted users' interactions on the Website, including their PII. Google received at least "Custom Events" and URLs that disclosed the products purchased by the user. Google also received additional PII, including but not limited to the users' IP address, device information, and User-IDs by matching IP addresses, device information, and User-IDs it intercepts and linking such information to an individual's specific identity.

101. For example, the Website utilizes Google's "cid" or "Client ID" function to identify users as they navigate the Website.

102. Similarly, Google also utilizes the "auid" or "Advertiser User ID," and "guid" or "Globally Unique Identifier," cookies which identify unique users and unique interactions with a website Defendant sent these identifiers with each consumer's "event" data.

103. In addition to User-IDs, upon receiving information from the Website, Google also utilizes a "browser-fingerprint" to personally identify consumers. A browser-fingerprint is information collected about a computing device that is used to identify the specific device.

104. These browser-fingerprints are used to uniquely identify individual users when a computing device's IP address is hidden, or cookies are blocked, and can provide a wide variety of data.

105. As Google explained, "[w]ith fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."

106. The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques. Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.

107. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.

108. Browser-fingerprints are personal identifiers. Tracking technologies, like the ones developed by Google and utilized on the Website, can collect browser-fingerprints from website visitors.

109. As enabled by Defendant, Google collects vast quantities of consumer data through its tracking technology.

110. Due to the vast network of consumer information it holds, Google matches the IP addresses, device information, User-IDs, and hashed versions of its account holders phone numbers and email addresses it intercepts and links such information to an individual's specific identity.

111. Google then utilizes such information for its own purposes, such as targeted advertising.

112. Google Analytics also links with Google Ads, allowing the data intercepted through Google Analytics to be utilized for targeted advertising purposes.[44] Such practices were in effect on the Website for targeted advertising purposes.

113. The DoubleClick API "is an integrated ad technology platform that enables advertisers to more effectively create, manage and grow high-impact digital marketing campaigns."

114. DoubleClick was acquired by Google in 2008. In 2018, the DoubleClick API was integrated with the Google Analytics API into the Google Marketing Platform. The Google Marketing Platform makes use of most of DoubleClick's features, albeit under different brand names: for example, "DoubleClick Bid Manager is now Display & Video 360," "DoubleClick Search is now named Search Ads 360," and DoubleClick Campaign Manager and DoubleClick Studio are now named Campaign Manager and Studio, respectively."

115. As relevant here, however, data is still sent from the Website to Google through the DoubleClick API, and app developers like Defendant can then use the Google Marketing Platform to manage the data.

116. Once integrated into a developer's mobile application, the DoubleClick API allows an app developer to, among other features, analyze and optimize marketing campaigns and conduct targeted advertising.

117. Once Defendant intercepts the Website communications through the DoubleClick API and discloses such information to Google (in real time), Google has the capability to use such information for its own purposes. "Google uses the information shared by sites and apps to deliver [] services, maintain and improve them, develop new services, measure the effectiveness of advertising, protect against fraud and abuse, and personalize content and ads you see on Google and on [] partners' sites and apps."

118. For example, Google utilizes the "auid" or "Advertiser User ID" cookies which identify unique users and unique interactions with a website.

119. Google also encodes the user's email address, to later match it to its own records.

[44] https://support.google.com/analytics/answer/9379420?hl=en#zippy=%2Cin-this-article

120. Google's range of SaaS services is based on Google's ability to collect and analyze information about consumers' web behavior and deliver targeted advertising to select consumers based on their web habits. This involves collecting visitor information from thousands of websites and then analyzing that information to deliver targeted advertising and group web users so that they can be targeted for products and categories they are interested in.

121. Information from websites, like Defendant's Website, is central to Google's ability to successfully market their advertising capabilities to future clients.

122. In sum, Google uses website communications to: (i) improve its own products and services; (ii) develop new Google for Business and Google Analytics products and services; and (iii) analyze website visitors' communications to assist with data analytics and targeted advertising.

123. Google views and processes every piece of information collected from the DoubleClick API, including the information collected from Defendant's Website, and uses it to assist with data analytics, marketing, and targeted advertising.

124. Google partners with Defendant in its marketing efforts. Google's tracking technologies, including Google Analytics, browser fingerprinting, and Google DoubleClick are employed on the Website in the manner described throughout this Complaint.

**H. Snapchat's Tracking Technologies**

125. Snapchat is a social media and messaging application that "offers a range of APIs through its Snap Kit, Lens Studio, and Marketing API, allowing developers to integrate Snapchat's features into their own applications."[45] Snapchat's Marketing API "is used for creating, managing, and optimizing advertising campaigns on Snapchat, including for targeting, budding, and tracking ad performance."[46]

126. Specifically, the Snapchat Marketing tool "provides a programmable interface to interact with Snapchat's advertising tools. This API enables automated creation and management

---

[45] Charu Mitra Dubey, *Snapchat API: Developer Guide on How to Integrate Snapchat API*, PHYLLO (July 10, 2024), https://www.getphyllo.com/post/snapchat-api-guide.

[46] *Id.*

of ad campaigns, audience targeting, and performance analytics, which can be a boom for marketers seeking to streamline their Snapchat advertising workflows."[47]

127. Snapchat offers a software service called "Snap Pixel," which "helps advertisers measure results, optimize targeting, and build audiences for their ad campaigns."[48] The Snap Pixel is part of a line of prebuilt software tools under the "Business" product line that allow the delivery of personalized ads by collecting user data through the Snap Pixel, which is used to deliver more effective targeted advertisements, increasing revenue for the websites that install the Pixel.

128. The Snap Pixel can be plugged into any website, as the pixel is "a piece of JavaScript code that's either installed on [a] website or integrated with an e-commerce store."[49]

129. When users interact with a webpage with the Snap Pixel installed, the Snap Pixel "tracks a variety of actions on [a] website, such as page views, add-to-cart actions, purchases, and sing-ups," as well as other "events," such as answering a quiz on a website.[50] The information is sent automatically to Snapchat.

130. The Snapchat Pixel "may send . . . (hashed) email addresses, (hashed) phone numbers and/or device identifiers, IP addresses, cookie IDs, metadata, and browser/app information" to Snap.[51] The information sent via is also accompanied with the sc_at cookie. Snapchat indicates that the sc_at cookie is "[u]sed to identify a visitor across multiple domains."[52]

131. The Snapchat advertising business model involves entering into voluntary partnerships with various companies and surveilling communications on their partners' websites with the Snap Pixel.

132. One of Snapchat's partners is Kicks Crew.

---

[47] *Snapchat Marketing API Integrations*, PIPEDREAM, https://pipedream.com/apps/snapchat-marketing.

[48] *Power Performance with the Snap Pixel*, SNAPCHAT, https://forbusiness.snapchat.com/advertising/snap-pixel.

[49] *Id.*

[50] *Id.*

[51] *Id.*

[52] *Cookie Information*, SNAPCHAT, https://www.snap.com/privacy/cooke-information.

133. Thus, through websites that install the Snap Pixel, Snapchat directly receives the electronic communications of website visitors entered into search bars, chat boxes, and online quizzes in real time.

134. When the Snap Pixel is used on an entry to a website, it is not like a tape recorder, or a "tool" used by one party to record the other. Instead, the Snap Pixel involves Snapchat, a separate and distinct third-party entity from the parties in the conversation. That data is then analyzed by Snapchat before being provided to any entity that was a party to the conversation, like Defendant.

135. The purpose of such transmissions is so companies, like Defendant, can better advertise and target consumers on Snap's social media platform by enabling Snap to learn who visits the companies' websites. This also benefits Snap, as it allows Snap to monetize its Snapchat social media platform through advertising revenue, and the better at targeting Snap is, the more companies, like Defendant, will pay to advertise on Snapchat.

136. Indeed, Snap provides various forms of targeted advertising based on the information it collects, including location and demographic targeting, e-mail based targeting, or targeting based on those similar to companies' "customer list or Pixel Custom Audience."[53] And, Snap will actually tell website operators like Defendant "how well your pixel setup matches events

[53] *Meet Your Audience*, SNAPCHAT BUSINESS, https://forbusiness.snapchat.com/advertising/targeting.

to Snapchat Accounts," enabling companies, like Defendant, to send further identifying information to Snap so it can better match website users to Snapchat accounts.[54]




**Figure 3**

137. Nowhere on the Website does Defendant request or receive users' affirmative consent. In fact, Defendant's express representations warrant the opposite. The Tracking Technologies are active as soon as the Website loads, before users could even conceivably be put on notice or provide affirmative consent to the tracking at issue here.

**I. Defendant's Use of the Tracking Technologies**

138. Pursuant to agreements with Third Parties (Meta, Google, and Snap) Defendant intentionally and voluntarily embedded the Tracking Technologies on the Website. As illustrated within this section, Defendant unlawfully disclosed personally identifiable information and consumer purchase information to Third Parties through Tracking Technologies, without customer consent, and contrary to its express warranties.

139. The Tracking Technologies are Source Code that do just that—they surreptitiously transmit a Website User's communications and inputs to the corresponding user IDs, much like a traditional wiretap.

140. Thus, Defendant is, in essence, handing its customers a tapped website and, once a webpage is loaded into the user's browser, the software-based wiretaps are quietly waiting for private communications on the webpage to trigger the Tracking Technologies, which then intercept

[54] *Snap Pixel: Power Your Ad Performance*, SNAPCHAT, https://forbusiness.snapchat.com/advertising/snap-pixel.

those communications—intended only for Defendant—and instantaneously transmit those communications to Meta, Google, and Snap or other third parties.

141. For example, when individuals visit Defendant's Website via an HTTP request to Defendant's server, Defendant's server sends an HTTP response (including the Markup) that displays the webpage visible to the User, along with Source Code (including the Tracking Technologies).

142. Third parties—including Meta, Google, and Snap—offer companies, including Defendant, snippets of code they can install in web browsers of users accessing their services. These code snippets uniquely identify the user and are sent with each intercepted communication to ensure the third party can identify the specific user associated with the information intercepted (in this case, confidential PII and purchase information).

143. Defendant intentionally configured the Tracking Technologies installed on its Website to capture both the "characteristics" of individual's communications with its Website (their IP addresses, Facebook ID, User-IDs, cookie identifiers, device identifiers, emails, names, and phone numbers) and the "content" of these communications (the buttons, links, pages, and tabs they click, and view related to the shopping and products sought from Defendant).

144. Defendant installs these Tracking Technologies despite its understanding that its customers reasonably anticipate their identifiable information to be kept confidential and undisclosed to Third Parties. This installation contradicts Defendant's express promise to keep PII confidential. *See supra*–Figure 1.

145. Contrary to its promise, as soon as consumers enter Defendant's Website, Defendant begins tracking, intercepting, and disclosing their interactions with the Website to the Third Parties.

146. When users access the Website, Defendant discloses the URLs and page titles of every page that they visit, including during the checkout process. The URLs and page titles disclose what type of product the user is seeking to purchase. For example, when a consumer clicks on a product, the URL of the page for that product, which includes information about the product is shared, is shared with Third Parties as enabled by Defendant. The Third Parties also

receive information when the consumer adds the product to their cart before checkout, and when they add their payment info. *See e.g.* Figs. 4–5 (Meta Interceptions); Figs. 6–7 (Google Interceptions; Fig. 8 (Snap Interception).

147. An example illustrates the point. When a customer views a product and adds it to their cart, Meta receives detailed information about the product, the price, and the user. Figs. 4–5.

| | |
|---|---|
| id | 509186303912827 |
| ev | InitiateCheckout |
| dl | https%3A%2F%2Faccount.kickscrew.com%2Fcheckouts%2Fcn%2FhWN9T7c9LgFh5KOMpllxuFui%2Fen%3F_r%3DAQAB8BCDCoj9zqKQTrgbz7Hy22QYgdOsnCOn1x2D5s8Ppb0%26_s%3De9891e11-ddc3-4bd1-adb6-fe71c6009839%26_y%3D48d72add-b518-4ea4-8daf-3b985801f2d0%26auto_redirect%3Dfalse%26edge_redirect%3Dtrue%26skip_shop_pay%3Dtrue |
| rl | https%3A%2F%2Fwww.kickscrew.com%2F |
| if | false |
| ts | 1772652256978 |
| cd[content_ids] | %5B8115631128771%5D |
| cd[content_type] | product_group |
| cd[currency] | USD |
| cd[value] | 156.8 |
| cd[num_items] | 1 |
| cd[contents] | %5B%7B%22id%22%3A8115631128771%2C%22sku%22%3A44226154889411%2C%22item_price%22%3A156.8%2C%22quantity%22%3A1%2C%22currency%22%3A%22USD%22%7D%5D |
| sw | 3072 |
| sh | 1728 |
| ncudff[country] | ** |
| udff[country] | 79adb2a2fce5c6ba215fe5f27f532d4e7edbac4b6a5e09e1ef3a08084a904621 |
| audff[country] | 79adb2a2fce5c6ba215fe5f27f532d4e7edbac4b6a5e09e1ef3a08084a904621 |
| v | 2.9.274 |
| r | stable |
| a | shopify_web_pixel |
| ec | 1 |
| o | 14366 |
| fbp | fb.1.1772652256945.917672615995608715 |
| ler | other |
| cdl | API_unavailable |
| pmd[locale] | en |
| plt | 4179.800000011921 |
| it | 1772652255750 |
| coo | false |
| dpo | |
| eid | sh-ba4ee2a5-83D8-4D8A-BA68-260C08EAA9F6 |
| expv2[0] | pl1 |
| expv2[1] | el3 |
| expv2[2] | bc1 |
| expv2[3] | ra2 |
| expv2[4] | rp2 |
| expv2[5] | ct2 |
| expv2[6] | hf1 |
| rqm | GET |

[{"id":8115631128771,
"sku":44226154889411,
"item_price":156.8,
"quantity":1,
"currency":"USD"}]

**Figure 4**

148. As the customer continues to progress through the checkout process, they are prompted to enter their email, name, phone number, and shipping address. Unbeknownst to

customers—Defendant intercepts and discloses this information to third party Meta, despite numerous promises it does not share this information.

149. Specifically, Defendant discloses to Meta the customer's hashed name (audff[fn/ln] and udff[fn/ln] values) and email (audff[em] and udff[em] values)). *See e.g.* Fig. 5.

| | |
|---|---|
| id | 509186303912827 |
| ev | AddPaymentInfo |
| dl | https%3A%2F%2Faccount.kickscrew.com%2Fcheckouts%2Fcn%2FhWN9T7c9LgFh5KOMpIlxuFui%2Fen%2F%3F_r%3DA QAB8BCDCoj9zqKQTrgbz7Hy22QYgdOsnCOn1x2D5s8Ppb0 |
| rl | https%3A%2F%2Fwww.kickscrew.com%2F |
| if | false |
| ts | 1772652446606 |
| cd[currency] | USD |
| cd[value] | 207.09 |
| sw | 3072 |
| sh | 1728 |
| ncudff[country] | ** |
| udff[country] | 79adb2a2fce5c6ba215fe5f27f532d4e7edbac4b6a5e09e1ef3a08084a904621 |
| ncudff[fn] | ****** |
| udff[fn] | fc5a299cd6cd644f40bdcc8f7ae00e89a4ae4fbc44031c4bc27e54dd4bcb9773 |
| ncudff[ln] | ******** |
| udff[ln] | c1d35cc3471fe509203d65b3e7a53fc82337ac9ae2c797b836621f706fe37df8 |
| ncudff[em] | ******%23%23%23%23%40*****.*** |
| udff[em] | 2a9a22d88b031064ea86ff104d1cabf6b14a866c2a4adf136def1330b49fecbb |
| audff[country] | 79adb2a2fce5c6ba215fe5f27f532d4e7edbac4b6a5e09e1ef3a08084a904621 |
| audff[fn] | fc5a299cd6cd644f40bdcc8f7ae00e89a4ae4fbc44031c4bc27e54dd4bcb9773 |
| audff[ln] | c1d35cc3471fe509203d65b3e7a53fc82337ac9ae2c797b836621f706fe37df8 |
| audff[em] | 2a9a22d88b031064ea86ff104d1cabf6b14a866c2a4adf136def1330b49fecbb |
| v | 2.9.274 |
| r | stable |
| a | shopify_web_pixel |
| ec | 8 |
| o | 15390 |
| fbp | fb.1.1772652256945.917672615995608715 |
| ler | other |
| cdl | API_unavailable |
| pmd[locale] | en |
| plt | 4179.800000011921 |
| it | 1772652379490 |
| coo | false |
| dpo | |
| eid | sh-ba54d1f9-D6D3-41C8-C6CF-5D556D866E3D |
| expv2[0] | pl1 |
| expv2[1] | el2 |
| expv2[2] | bc1 |
| expv2[3] | ra2 |
| expv2[4] | rp2 |
| expv2[5] | ct2 |
| expv2[6] | hf1 |
| rqm | FGET |

**Figure 5**

150. In addition to intercepting consumers' communications throughout the checkout process, Meta's tracking technology on the Website also intercepts various cookie identifiers,

including the sb, datr, c_user, xs, and fr cookies. The c_user cookie, which it associates with various communications and events, is the equivalent of a user identification number unique to each Facebook user.

151. The same holds true with Google's tracking technologies. On the checkout page, Plaintiff and other users of Defendant's Website are prompted to enter their email address, phone number, name, and address. When a user completes the checkout process, Defendant intercepts and discloses the user's email to Google through Google's tracking technology. The purchaser's email is intercepted through Google's tracking technology in an encoded format. Fig. 7. Google associates all this information with its unique identifier, the auid, and various tracking cookies. *Id.* Google receives information, including hashed email (i.e., PII), payment event details, and item details, which it associates with an auid. *See e.g.* Figs. 6–7.

| | |
|---|---|
| frm | 0 |
| ae | g |
| en | page_view |
| dl | https%3A%2F%2Fwww.kickscrew.com%2Fproducts%2Fnike-air-max-tl-2-5-black-citron-fz4110-003 |
| scrsrc | measure.kickscrew.com |
| rnd | 94336466.1772652198 |
| dt | Nike%20Air%20Max%20TL%202.5%20%27Black%20Citron%27%20FZ4110-003 |
| auid | 324745034.1772652198 |
| navt | n |
| npa | 1 |
| ep.ads_data_redaction | 0 |
| gtm | 45Fe6330v9193895620za204zd9193895620xea |
| gcd | 13l3l3l2l1l1 |
| dma_cps | a |
| dma | 1 |
| tag_exp | 103116026~103200004~115616986~115938466~115938469~116024733~117484252 |
| apve | 1 |
| apvf | f |
| gap.gtb | 2 |
| apvc | 0 |
| tft | 1772652220262 |
| tfd | 39802 |

**Figure 6**

| | |
|---|---|
| gtm | 45be6330v882945702za200zd882945702xec |
| gcs | G111 |
| gcd | 13t3t3t3t5l1 |
| dma | 0 |
| tag_exp | 103116026~103200004~104573694~115616986~115938466~115938468~116024733~117484252~117755069 |
| did | dN2ZkMj%2CdNTU0Yz%2CdYmNjMT%2CdNzYwYj |
| gdid | dN2ZkMj.dNTU0Yz.dYmNjMT |
| edid | dNzYwYj |
| npa | 0 |
| frm | 0 |
| pscdl | noapi |
| auid | 324745034.1772652198 |
| uaa | x86 |
| uab | 64 |
| uafvl | Not%253AA-Brand%3B99.0.0.0%7CGoogle%2520Chrome%3B145.0.7632.117%7CChromium%3B145.0.7632.117 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| ec_mode | c |
| _tu | AAI |
| em | tv.1~em.Kpoi2IsDEGTqhv8QTRyr9rFKhmwqSt8Tbe8TMLSf7Ls~rg0.ca~co0.US |
| ecsid | 1679178423.1772652255 |

**Figure 7**

152. Defendant also intercepts and discloses consumers' communications and personally identifiable information to Snapchat as they progress through the checkout process. Snapchat receives the customer's hashed email (u_hem parameter), phone number (u_hpn parameter), first/last name (u_fn and u_ln parameters), city (l_city parameter), zip code (l_gc parameter), and country (l_gpc parameter). This information is associated with detailed product information (*see, e.g.* e_desc, e_pr, and e_cur parameters). *See e.g.* Fig. 8.

//

//

//

//

```
    "ctx": {
        "bt": "1d53c387",
        "c1": "6ad697dd-02b3-433b-aa68-7fda2684f820",
        "lc": "08e3e611-8844-42ed-985a-c01f3c10f692",
        "ls": "f9b671fb-e40a-43c9-ac23-765da2477b6a",
        "r": "50f97c7a-e6eb-4ec3-acfe-d92b6d2d5d17",
        "si":
"Fptq1pfdArM5O81of9omhPggJlpeWENaOsIzw_fKSNcq3bUYraTnrzuYWAHy0ARb4WzLRoVW-bZx--QKx8mKI3Zdokd7arU6OHcIUD3l60FArcoQYWVM4Q
7-KfFBynuZuCACOPmEYhE6u2tWsAfPBD2ksRnrZ2smpoGUPl8eubrzMNV_tkrbS1dFxx9Mwn8Ig",
        "ss": "eb4140ad-ca10-4165-a0e1-07c2da7c3bf8",
        "if": true,
        "mtp": -1,
        "ua":
"Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/145.0.0.0 Safari/537.36",
        "url":
"https://account.kickscrew.com/checkouts/cn/hWN9T7c9LgFh5KOMpIlxuFui/en?_r=AQAB8BCDCoj9zqKQTrgbz7Hy22QYgdOsnCOn1x2D5s8P
s=e9891e11-ddc3-4bd1-adb6-fe71c6009839&_y=48d72add-b518-4ea4-8daf-3b985801f2d0&auto_redirect=false&edge_redirect=true&s
hop_pay=true",
        "v": "3.54.1-2603021739",
        "a": [504, 504, 587, 587, 2],
        "ic": true,
        "p": [null, null, null, null, null],
        "sa": 1772652253676,
        "sps": 193010,
        "ts": 1772652446686,
        "d_a": "x86",
        "d_bvs":
"[,{\"brand\":\"Not:A-Brand\",\"version\":\"99.0.0.0\"}{\"brand\":\"Google Chrome\",\"version\":\"145.0.7632.117\"}{\"b
":\"Chromium\",\"version\":\"145.0.7632.117\"}]",
        "d_ot": "Windows",
        "d_os": "19.0.0",
        "huah": true
    },
    "req": [{
        "t": {
            "pid": "37e90369-d9a8-4d4e-abff-ed6474b4d27c",
            "ev": "ADD_BILLING",
            "intg": "shopify-wpe",
            "u_c1": "48d72add-b518-4ea4-8daf-3b985801f2d0",
            "cdid": "sh-ba54d1f9-D6D3-41C8-C6CF-5D556D866E3D",
            "u_hed": "b33960790a6de22ca95a61c6d1310b3487304529cb0af6f3e9b80d2e5ddf76b8",
            "u_hem": "2a9a22d88b031064ea86ff104d1cabf6b14a866c2a4adf136def1330b49fecbb",
            "u_hpn": "f90d52384cf1496a98d7b49c3b1f973ce92de21c13cdb518e67198685cc1e5ed",
            "u_fn": "fc5a299cd6cd644f40bdcc8f7ae00e89a4ae4fbc44031c4bc27e54dd4bcb9773",
            "u_ln": "c1d35cc3471fe509203d65b3e7a53fc82337ac9ae2c797b836621f706fe37df8",
            "l_gc": "79adb2a2fce5c6ba215fe5f27f532d4e7edbac4b6a5e09e1ef3a08084a904621",
            "l_city": "e38d0400ecd92400d7728a55e23d3a9a0806c16f56658e53954a81fce69584f8",
            "l_gpc": "e5eae864c146c23e14e68edcfd3838910eacbbce3fc27a52089a38bcaf98a3b9",
            "e_bds": ["Nike"],
            "e_iids": ["44226154889411"],
            "e_ni": 1,
            "e_desc":
"[{\"title\":\"Nike Air Max TL 2.5 'Black Citron' FZ4110-003\",\"quantity\":1,\"product_id\":\"8115631128771\",\"varian
":\"44226154889411\",\"sku\":\"FZ4110-003-110\",\"variant_title\":\"MENS / Men's US 11 / Women's US 12.5 / UK 10 / EU 4
P 29\",\"product_vendor\":\"Nike\",\"price\":156.8}]",
            "e_pr": 207.09,
            "e_cur": "USD",
            "u_sclid": "f9b671fb-e40a-43c9-ac23-765da2477b6a",
            "u_scsid": "eb4140ad-ca10-4165-a0e1-07c2da7c3bf8",
            "gac": "732523c9"
        },
        "del": 25
    }],
    "u_scsid": "eb4140ad-ca10-4165-a0e1-07c2da7c3bf8"
```


**Figure 8**

//

//

//

//

### J. The Tracking Technologies Also Operate As Pen Registers

153. When companies build their websites, they install or integrate various third-party scripts into the code of the website to collect data from users or perform other functions.[55]

154. Often, third-party scripts are installed on websites "for advertising purposes."[56] Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete profile of the user over time."[57]

155. Defendant incorporates the Third Parties' Tracking Technologies' code into the code of its Website, including when Plaintiff and Class Members visited the Website. Thus, when Plaintiff and Class Members visited the Website, Defendant caused the Tracker to be installed on Plaintiff's and Class Members' browsers. This allowed the Third Parties—through their respective Technologies—to collect Plaintiff's and Class Members' IP addresses and Device Metadata and pervasively track them across the Internet.

156. The Tracking Technologies also cause additional data points to be sent from Plaintiff's and Class Members' browser to the Third Parties, which are meant to uniquely identify users across sessions and devices. In addition to the public IP address, key elements include the user-agent string (browser, operating system, and device type) and device capabilities such as supported image formats and compression methods. Persistent identifiers including the c_user, guid, cid, and auid, ensure users can be tracked even after clearing standard session data like cookies. Advanced methods like fingerprinting and server-side matching remain unaffected by cookie deletion. Combined, these elements form a detailed, unique fingerprint that allows for cross-site tracking and behavioral profiling.

157. Defendant and the Third Parties then use the public IP addresses, Device Metadata, and unique identifiers of the Website's visitors that are collected and sent by the Tracking

---

[55] See *Third-party Tracking*, PIWIK, https://piwik.pro/glossary/third-party-tracking/ ("Third-party tracking refers to the practice by which a tracker, other than the website directly visited by the user, traces or assists in tracking the user's visit to the site. Third-party trackers are snippets of code that are present on multiple websites. They collect and send information about a user's browsing history to other companies . . .").

[56] *Id.*

[57] *Id.*

Technologies, including those of Plaintiff and Class Members, to de-anonymize Plaintiff and Class Members, serve hyper-targeted advertisements on Plaintiff and Class Members, and unjustly enrich themselves through this improperly collected information.

158. At no time prior to the installation and use of the Tracking Technologies on Plaintiff's and Class Members' browsers, or prior to the use of the Tracker, did Defendant procure Plaintiff's and Class Members' consent for such conduct. Nor did Defendant obtain a court order to install or use the Tracking Technologies.

159. Because, as described herein, the Tracking Technologies also collect users' addressing, routing, or signaling information—IP addresses, Device Metadata, and/or the unique user IDs—the Tracking Technologies also operate as pen registers.

**K. Defendant Did Not Anonymize Consumer Data By Disclosing "Hashed" Values To Third Parties**

160. The Federal Trade Commission routinely evaluates privacy representations by companies. When it comes to hashing the FTC has said the following:

> Companies often claim and act as if data that lacks clearly identifying information is anonymous, but data is only anonymous when it can never be associated back to a person. If data can be used to uniquely identify or target a user, it can still cause that person harm.
>
> One way that companies obscure personal data is through "hashing." Hashing involves taking a piece of data—like an email address, a phone number, or a user ID—and using math to turn it into a number (called a hash) in a consistent way: the same input data will always create the same hash.
>
> . . .
>
> This logic is as old as it is flawed – hashes aren't "anonymous" and can still be used to identify users, and their misuse can lead to harm. Companies should not act or claim as if hashing personal information renders it anonymized. FTC staff will remain vigilant to ensure companies are following the law and take action when the privacy claims they make are deceptive.[58]

---

[58] *No, hashing still doesn't make your data anonymous*, FEDERAL TRADE COMMISSION (Jul. 24, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/07/no-hashing-still-doesnt-make-your-data-anonymous.

161. Thus, through the tracking technologies provided by the Third Parties, Defendant intercepted and disclosed Plaintiff and Class Members personally identifiable information regardless of whether it was hashed or in plain text.

## CLASS ALLEGATIONS

162. **Class Definition:** Plaintiff brings this action individually and on behalf of various classes of persons similarly situated, as defined below, pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

> The **Nationwide Class** that Plaintiff seeks to represent is defined as: All individuals residing in the United States who made a purchase on the website, www.kickscrew.com, during the Class Period.
>
> The **California Subclass** that Plaintiff seeks to represent is defined as: All individuals residing in California who made a purchase on the website, www.kickscrew.com, during the Class Period.

163. The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment.

164. The Nationwide Class and California Subclass are referred to collectively as the "Classes."

165. Excluded from the proposed Classes are Defendant; any affiliate, parent, or subsidiary of Defendant, any entity in which Defendant has a controlling interest; any officer, director, or employee of Defendant, any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

166. Plaintiff reserves the right to amend the definitions of the Class or Subclass and add subclasses if further information and discovery indicate that the definitions should be narrowed, expanded, or otherwise modified.

167. **Numerosity:** Members of the Classes are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiff at this time. However, it is estimated that there are at least thousands of individuals in the

Classes. The identity of such membership is readily ascertainable from Defendant's records and third-parties Meta, Google, and Snap's records.

168. **<u>Existence and Predominance of Common Questions of Fact and Law</u>:** There is a well-defined community of interest in the questions of law and fact involved affecting the members of the proposed Classes. The questions of law and fact common to the proposed Classes predominate over questions affecting only individual class members. Such questions include, but are not limited to, the following:

a. Whether Defendant's acts and practices violated the ECPA.

b. Whether Defendant's acts and practices violated CIPA § 631;

c. Whether Defendant's acts and practices violated CIPA § 632;

d. Whether Defendant's acts and practices violated CIPA § 638.51;

e. Whether Defendant's acts and practices violated the privacy rights of Plaintiff and members of the California Class under the California Constitution; and

f. Whether Plaintiff and members of the proposed Classes are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

169. **<u>Typicality</u>:** The claims of the named Plaintiff are typical of the claims of the Classes because the Plaintiff, like all other class members, visited the Website and had his confidential electronic communications intercepted and disclosed to Third Parties.

170. **<u>Adequacy</u>:** Plaintiff is an adequate representative of the Classes because his interests do not conflict with the interests of the Classes he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously. The interests of the Classes will be fairly and adequately protected by Plaintiff and his counsel.

171. **<u>Superiority</u>:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Classes. Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by

the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues. Finally, Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making it appropriate for this Court to grant final injunctive relief and declaratory relief with respect to the Classes as a whole.

## CAUSES OF ACTION

### COUNT I
**Violation Of The Electronic Communication Privacy Act,**
**18 U.S.C. § 2511, *et seq.***
**(On Behalf of the Nationwide Class)**

172. Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

173. Plaintiff brings this claim on behalf of himself and members of the Nationwide Class.

174. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

175. The ECPA protects both the sending and the receipt of communications.

176. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

177. The transmission of Plaintiff's sensitive and personal information to Defendant's website qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

178. The transmission of PII between Plaintiff and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire,

radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

179. The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

180. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

181. The ECPA defines "electronic, mechanical, or other device," as "any device . . . which can be used to intercept a[n] . . . electronic communication[.]" 18 U.S.C. § 2510(5).

182. The following instruments constitute "devices" within the meaning of the ECPA:

a. The computer codes and programs Defendant and Meta used to track Plaintiff's and Class Members' communications while they were navigating the Website;

b. The computer codes and programs Defendant and Google used to track Plaintiff's and Class Members' communications while they were navigating the Website;

c. The computer codes and programs Defendant and Snap used to track Plaintiff's and Class Members' communications while they were navigating the Website;

d. Plaintiff's and Class Members' browsers;

e. Plaintiff's and Class Members' mobile devices;

f. Defendant's and Meta's web and ad servers;

g. Defendant's and Google's web and ad servers;

h. Defendant's and Snap's web and ad servers

i. The plan that Defendant and Meta carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website; and

j. The plan that Defendant and Google carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were

using a web browser to navigate the Website; and

k. The plan that Defendant and Snap carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website.

183. Plaintiff's and Class Members' interactions with Defendant's Website are electronic communications under the ECPA.

184. By utilizing and embedding the tracking technologies provided by Meta, Google, and Snap on the Website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class Members in violation of 18 U.S.C. § 2511(1)(a).

185. Specifically, Defendant intercepted—in real time—Plaintiff's and Class Members' electronic communications via the tracking technologies provided by Meta, Google, and Snap on its website, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' PII and sensitive and personal information to Meta, Google, and Snap.

186. The Defendant intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class Members regarding their PII, including their identities and information related to their purchase on the Website. This confidential information is then monetized for targeted advertising purposes, among other things.

187. By intentionally disclosing or endeavoring to disclose Plaintiff's and Class Members' electronic communications to Meta, Google, and Snap through the Tracking Technologies, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

188. By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

189. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy and associating the content of Plaintiff's and Class members' electronic communications with preexisting consumer profiles and using the contents of their electronic communications in a manner that exceeds what Defendant promised Plaintiff and Class members on its Website.

190. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

191. As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may award statutory damages to Plaintiff and Class Members; injunctive and declaratory relief; punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future; reasonable attorney's fees; and other litigation costs reasonably earned.

## COUNT II
## Violation Of The California Invasion Of Privacy Act, Cal. Penal Code § 631 (On Behalf of the California Subclass)

192. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

193. Plaintiff brings this claim against Defendant individually and on behalf of the California Subclass.

194. The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630–638. CIPA begins with its statement of purpose—namely, that the purpose of CIPA is to "protect the right of privacy of the people of [California]" from the threat posed by "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . ." Cal. Penal Code § 630.

195. A person violates California Penal Code § 631(a), if:

> By means of any machine, instrument, or contrivance, or in any other manner, [s/he] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable or instrument of any internal telephonic communication system, or [s/he] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [s/he] uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained . . . .

Cal. Penal Code § 631(a).

196. Further, a person violates § 631(a) if s/he "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned" in the preceding paragraph. *Id.*

197. To avoid liability under § 631(a), a defendant must show it had the consent of <u>all</u> parties to a communication.

198. At all relevant times, Defendant aided, agreed with, and conspired with the Third Parties to track and intercept Plaintiff's and Class Members' internet communications while accessing the Website. These communications were intercepted without the authorization and consent of Plaintiff and Class Members

199. Defendant, when aiding and assisting the Third Parties' wiretapping and eavesdropping, intended to help Meta, Google, and Snap learn some meaning of the content in the URLs and the content the visitor requested.

200. The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Tracking Technologies fall under the broad catch-all category of "any other manner":

(a) The computer codes and programs the Third Parties used to track Plaintiff and Class Members' communications while they were navigating www.kickscrew.com;

(b) Plaintiff's and Class Members' browsers;

(c) Plaintiff's and Class Members' computing and mobile devices;

(d) Meta's web and ad servers;

(e) Google's web and ad servers;

(f) Snap's web and ad servers.

201. The web and ad-servers from which the Third Parties tracked and intercepted Plaintiff's and Class Members' communications while they were using a web browser to access or navigate www.kickscrew.com;

202. The computer codes and programs used by the Third Parties to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a browser to visit www.kickscrew.com; and

203. The plan the Third Parties carried out to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to visit www.kickscrew.com.

204. The information that Defendant transmitted using Tracking Technologies constituted sensitive and confidential personally identifiable information.

205. As demonstrated hereinabove, Defendant violated CIPA by aiding and permitting the Third Parties to receive its customers' sensitive and confidential online communications through www.kickscrew.com without their consent.

206. As a result of the above violations, Defendant is liable to Plaintiff and other Class Members in the amount of, the greater of, $5,000 per violation or three times the amount of actual damages. Additionally, Cal. Penal Code § 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered or be threatened with, actual damages." Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future.

**<u>COUNT III</u>**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 632**
**(On Behalf of the California Subclass)**

207. Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

208. Plaintiff brings this claim against Defendant individually and on behalf of the California Subclass.

209. Cal. Penal Code § 632 prohibits "intentionally and without the consent of all parties to a confidential communication," the "use[] [of] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication..

210. Section 632 defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]"

211. The data collected on Defendant's Website constitutes "confidential communications," as that term is used in Section 632, because class members had an objectively reasonable expectation of private with respect to their personally identifiable information.

212. Plaintiff and Class Members expected their communications to Defendant to be confined to Defendant in part, because of Defendant's consistent representations that these communications would remain confidential. Plaintiffs and Class Members did not expect third parties, and specifically Meta, Google, and Snap, to secretly eavesdrop upon or record this information and their communications.

213. The Tracking Technologies from Third Parties, are all electronic amplifying or recording devices for purposes of § 632.

214. By contemporaneously intercepting and recording Plaintiff's and Class members' confidential communications to Defendant through this technology, the Third Parties eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 632 of CIPA.

215. At no time did Plaintiff or Class members consent to Defendant or Third Parties conduct, nor could they reasonably expect that their communications to Defendant would be overheard or recorded by Third Parties.

216. The Third Parties utilized Plaintiff's and Class members' personally identifiable information for their own purposes, including advertising and analytics.

217. Defendant is liable for aiding and abetting violations of Section 632 by the Third Parties (i.e., Meta, Google, and Snap).

218. Pursuant to Cal. Penal Code § 637.2, Plaintiff and Members of the California Subclass have been injured by the violations of Cal. Penal Code § 632, and each seek damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

## COUNT IV
## Violation Of The California Invasion Of Privacy Act, Cal. Penal Code § 638.51(a)

219. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

220. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

221. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

222. CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

223. A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

224. The Tracking Technologies are "pen registers" because they are a "device or process" that recorded or decoded the "routing, addressing, or signaling information"—the IP address, Device Metadata, and unique user IDs—from the electronic communications transmitted

by Plaintiff's and Class Members' computers or smartphones. Cal. Penal Code § 638.50(b); *see also Lesh*, 767 F. Supp. 3d at 40–42.

225. Likewise, the Tracking Technologies are "pen registers" because they are a "device or process" that is being used to ascertain the identity of visitors to Defendant's Website and are thus capturing "addressing" information. *Greenley*, 684 F. Supp. 3d at 1050 ("software that identifies consumers" is a pen register).

226. At all relevant times, Defendant installed the Tracking Technologies—which are pen registers—on Plaintiff's and Class Members' browsers, which allowed the Third Parties to record or decode Plaintiff's and Class Members' IP addresses and Device Metadata. The Tracking Technologies also set unique user identifiers on Plaintiff's and Class Members' browsers so the Third Parties—here, Meta, Google, and Snap could deanonymize Plaintiff and Class Members and track them across multiple Website sessions and multiple websites.

227. Defendant and the Third Parties used the information collected by the Tracking Technologies to:

(a) identity Plaintiff and Class Members and either create new profiles of them in the Third Parties' respective databases and/or to match Plaintiff and Class Members to pre-existing profiles (either in the Third Parties' own databases or with another entity's profile);

(b) sell Plaintiff's and Class Members' information to advertisers for hyper-targeted advertising based on the information collected by the Tracking Technologies on the Website and the information contained on any profiles of Plaintiff and Class Members (which are linked to Plaintiff and Class Members via the information collected by the Third Parties on the Website);

(c) actually target Plaintiff and Class Members with advertisements and serve advertisements on Plaintiff and Class Members based on the information collected by the Third Parties on the Website and the information contained on any profiles of Plaintiff and Class Members (which are linked to Plaintiff and Class Members via

the information intercepted, collected, and disclosed by the Third Parties on the Website); and

(d) deanonymize Plaintiff and Class Members and generate revenue from the sale of Plaintiff's and Class Members' information—both what is collected on the Website by the Third Parties and the profiles this information is linked to—to advertisers, thus boosting Defendant's, advertisers', and Third Parties' revenue and the value of Third Parties' services.

228. The Tracking Technologies collect both contents and recording information relating to Plaintiff's and Class Members' electronic communications with the Website. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1108 (9th Cir. 2014) ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up); *Deivaprakash*, 2025 WL 2541952, at *3; *Fregosa*, 2025 WL 2886399, at *5.

229. Plaintiff and Class Members did not provide their prior consent for Defendant's installation or use of the Tracking Technologies. Nor did Defendant obtain a court order to install or use the Tracking Technologies.

230. Pursuant to Cal. Penal Code § 637.2(a), Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 638.51(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 638.51(a).

## COUNT V
## Invasion of Privacy Under California's Constitution
## (On Behalf of the California Subclass)

231. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

232. Plaintiff brings this claim against Defendant individually and on behalf of the California Subclass.

233. Plaintiff and Class Members have an interest in: (1) precluding the dissemination of their sensitive, confidential online communications; and (2) making personal decisions and/or conducting personal activities without observation, intrusion, or interference, including, but not

limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff's and Class Members' knowledge or consent.

234. At all relevant times, by using the Tracking Technologies to record and communicate their sensitive and confidential online communications, Defendant intentionally invaded Plaintiff's and Class Members' privacy rights under the California Constitution.

235. Plaintiff and Class Members had a reasonable expectation that their sensitive and confidential online communications, identities, and other data would remain confidential and that Defendant would not install wiretaps on www.kickscrew.com .

236. Plaintiff and Class Members did not authorize Defendant to record and transmit Plaintiff's and Class Members' sensitive confidential online communications.

237. The invasion of privacy was serious in nature, scope, and impact because it related to their sensitive and private online communications. Moreover, it constituted an egregious breach of societal norms underlying the privacy right because Defendant promised to keep Plaintiff and Members of the California Subclass's communications confidential.

238. Accordingly, Plaintiff and members of the California Subclass seek all relief available for invasion of privacy claims under California's Constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a) For an order certifying the putative Nationwide Class and California Subclass defined above, naming Plaintiff as the representative of the putative Classes, and naming Plaintiff's attorneys as Class Counsel to represent the putative Class and Subclass Members;

(b) For an order declaring that the Defendant's conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiff and the putative Classes on all counts asserted herein;

(d) For statutory damages in amounts to be determined by the Court and/or jury;

(e) For prejudgment interest on all amounts awarded;

(f) For injunctive relief as pleaded or as the Court may deem proper; and

(g) For an order awarding Plaintiff and the putative Classes their reasonable attorneys' fees and expenses and costs of suit.

**JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury for any and all issues in this action so triable of right.

Dated: March 16, 2026

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Philip L. Fraietta*
Philip L. Fraietta

Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Tel: (914) 874-0710
Fax: (914) 206-3656
E-Mail: pfraietta@bursor.com

*Counsel for Plaintiff*